IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | 2:24-cr-00160 |
| | ) | |
| DANIEL JACKSON | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO
SUPPRESS PHYSICAL EVIDENCE (ECF No. 158)**

Defendant Daniel Jackson ("Defendant") has filed a Motion to Suppress Physical Evidence
(ECF No. 158). In his Motion Defendant argues that the warrant obtained from a federal Magistrate
Judge and used to search his residence on June 27, 2024, lacked probable cause, and was also so
facially deficient that no reasonable police officer could have relied upon it in good faith when
executing the search that it authorized. According to the Defendant, the Fourth Amendment
therefore requires the Court to suppress the physical evidence seized during that search. The
Motion has been fully briefed (ECF Nos. 159 & 162) the Court has heard oral argument on its
merits (ECF No. 179) and conducted an evidentiary hearing at the Defendant's request (ECF No.
259). The Motion is now ripe for disposition. For the following reasons, Defendant's Motion to
Suppress is DENIED.

**FACTUAL BACKGROUND**

Defendant was charged with several drug and firearm crimes in an original, (ECF No. 55),
and then superseding indictment (ECF No. 184). The factual basis for Defendant's charges
stemmed from a search conducted at his residence on June 27, 2024. That day, Drug Enforcement
Administration ("DEA") Agents found approximately 23 kilograms of cocaine in the basement of
the Defendant's home, along with a Taurus 9mm pistol with an obliterated serial number, a money

1

(currency) counter, a black .223 caliber "ghost gun" rifle, and over $30,000 in United States currency. Defendant was immediately charged after the search was completed via federal criminal complaint and subsequently twice indicted by a federal Grand Jury.

The DEA Agents had a warrant to search Defendant's residence. The warrant was issued by a United States Magistrate Judge. The warrant described what property was to be searched and what items were to be seized by reference to two attached documents which set out the full scope of the searches authorized by the warrant, including several homes and vehicles. The first attachment identified Defendant's property among others by its address and included a photograph of the residence. The second attachment authorized agents to seize any evidence, contraband, fruits, or instrumentalities of federal drug or firearm charges. It also authorized agents to seize cellular telephones found at Defendant's residence, and to search any seized phones for communication records, documents, and other information related to suspected criminal activity.

The foundation for this warrant was an affidavit sworn out by DEA Special Agent Katelyn Bages. Agent Bages had been an active participant in an ongoing investigation concerning large-scale drug trafficking in Allegheny County, Pennsylvania. During her investigation she and other law enforcement officers tracked the movements of Defendant's co-defendants through physical surveillance, video surveillance, and the use of GPS location data. Particularly relevant to Defendant's Motion, law enforcement had closely tracked the whereabouts and activities of co-defendant Derrick Lyman.

Mr. Lyman was connected to and seemingly at the center of the sale and distribution of illegal narcotics, specifically cocaine. During the investigation of Mr. Lyman, a method of operation became apparent. Mr. Lyman and his associates would transport large quantities of cocaine in suitcases and duffle bags and various similar containers. The warrant affidavit also

described in some considerable detail at least two occasions when Mr. Lyman was observed in the presence of and/or causing the transport of multi-kilogram quantities of cocaine and/or tens (or even hundreds) of thousands of dollars of cash in suitcases and other luggage or similar bags. (ECF No. 158-1 ¶¶ 21, 35). Mr. Lyman and those associated with him were also frequently observed carrying various different types of luggage and bags and were further observed leaving these containers with associates or picking them up from their homes or elsewhere, at times after relatively short visits. (ECF No. 158-1 ¶¶ 14-15, 52, 54-57, 65, 71, 83, 86). Based on these observations, Agent Bages believed that Mr. Lyman's method of operation was to transport illegal narcotics and United States currency between locations, including private homes, utilizing seemingly innocuous bags and suitcases. (ECF No. 158-1 ¶ 58).

During her investigation, Agent Bages received evidence of three interactions between Mr. Lyman and the Defendant. These interactions were detailed in Agent Bages's affidavit, and they served as a central part of the basis for the search of the Defendant's residence. (ECF No. 158-1 ¶¶ 72-74, 87).

First, GPS tracking data revealed that Mr. Lyman visited Defendant's home on June 14, 2024 at 5:02 PM. (ECF No. 158-1 ¶ 72). This was almost two weeks prior to the search of the Defendant's house. The GPS data had shown that Mr. Lyman left his own residence at 2:56 PM and had traveled to "a car wash, Popeyes, and Home Depot" before arriving at the Defendant's home. (ECF no. 158-1 ¶ 72). The GPS data recorded Mr. Lyman arriving at the Defendant's home at 5:02 PM and then leaving Defendant's home at approximately 5:34 PM. (ECF No. 158-1 ¶ 72). Physical surveillance witnessed Mr. Lyman arrive back at his own residence at 6:00 PM that night and enter it empty handed. (ECF No. 158-1 ¶ 72).

Then, a week later, on June 21, 2024 at 2:47 PM, physical surveillance witnessed Defendant arrive at Mr. Lyman's home and remove a suitcase from a vehicle he had been driving and take it into Mr. Lyman's house. (ECF No. 158-1 ¶ 73). Approximately 25 minutes later, at 3:12 PM, surveillance observed Defendant leave Mr. Lyman's house carrying that same suitcase. (ECF No. 158-1 ¶ 74). Agent Bages stated in her affidavit that the suitcase appeared to be heavier when Defendant was leaving with it, noting that he struggled to place it into his vehicle. (ECF No. 158-1 ¶ 74).

Finally, GPS tracking data linked Mr. Lyman to a second visit at the Defendant's home on June 23, 2024, four days before the search of Defendant's home. (ECF No. 158-1 ¶ 87). This visit was during a series of visits by Mr. Lyman to various other locations that same day, visits which Agent Bages believed were all drug deliveries. (ECF no. 158-1 ¶ 89). Notably during this second visit to Defendant's home, Mr. Lyman had a duffel bag in his car. (ECF No. 158-1 ¶ 87). Physical surveillance had observed Mr. Lyman putting the duffle bag into his vehicle, and then GPS tracking data showed that Mr. Lyman arrived at Defendant's home at 10:47 PM and departed at 11:42 PM. As there was no surveillance at Defendant's home during this time, the affidavit contains no evidence that Mr. Lyman did or did not remove this duffle bag from his vehicle after arriving at Defendant's home. Agent Bages concluded that in the context of all the matters set out in her affidavit, these three interactions between Mr. Lyman and the Defendant were sufficient evidence to reasonably suspect Defendant was participating in Lyman's overall drug trafficking scheme and was keeping kilograms of illegal narcotics received from Mr. Lyman at his home. (ECF No 158-1 ¶¶ 76, 89).

Agent Bages's affidavit outlines how her experience and training informed her conclusion that Defendant was participating in a drug trafficking scheme. Prior to her three years of working

as a DEA Special Agent, Katelyn Bages worked as a campus police officer with the Missouri University of Science and Technology Police Department. (ECF No. 158-1 ¶ 2). She also served as a Sergeant with the federal Department of Defense Police, working as a uniformed security officer at the National Security Headquarters. (ECF No. 158-1 ¶ 2). In her time as a DEA Special Agent, Agent Bages has been trained in the methods used by traffickers to transport, store and distribute drugs and has been personally involved with previous drug investigations. (ECF No. 158-1 ¶ 2). In her affidavit, Agent Bages stated that based on her experience she was confident that the three interactions between the Defendant and Mr. Lyman indicated the Defendant was involved in illegal drug trafficking activity seemingly being led by Mr. Lyman.

## PROCEUDRAL HISTORY

Defendant filed his Motion to Suppress arguing that the warrant used to search his residence lacked probable cause to search that location, and no exception to the warrant requirement applies. (ECF No. 158). The Government filed a Response arguing that the warrant was indeed supported by probable cause, and even if it was not, the "Good Faith exception" justifies denying Defendant's Motion to Suppress. (ECF No. 159). Defendant filed a Reply, (ECF No. 162), and the Court then held oral argument on the matter. (ECF No. 179). After argument, the Court held an evidentiary hearing at the Defendant's request on a subsidiary argument relative to the Defendant's Motion and authorized and received post-hearing briefing. (ECF No. 257).

### I.    Defendant's Motion to Suppress.

Defendant argues that when removing what he describes as conclusory statements from the affidavit underlying the warrant, it lacks probable cause to search his residence. The Defendant argues that the warrant to search his home is based only on his above-stated connections with Mr. Lyman. Defendant asserts that the factual allegations in the underlying affidavit detail three

interactions between himself and Mr. Lyman, and then argues that the facts presented in the affidavit surrounding these interactions show only that he visited Mr. Lyman's house with a suitcase, entered and left Mr. Lyman's house with that suitcase, and that Mr. Lyman visited the Defendant's house twice, including once with a duffel bag in his (Lyman's) car.

Defendant argues that the search of his residence was premised exclusively on these interactions as described in the search warrant affidavit, then drawing a comparison to the evidence used to justify the searches of his co-defendant's homes which had included anonymous tips that those others were engaged in drug trafficking, observations of multiple short visits to multiple people suspected of illegal drug trafficking activity, and the observed results of drug and cash transactions made by confidential informants, with none involving or pointing to the Defendant. According to Defendant, his three visits occurring over two weeks with Mr. Lyman are insufficient on their own to create probable cause he was involved in criminal activity, and the warrant affidavit offers nothing beyond those visits coupled with a reference to his prior federal conviction for possession of cocaine with intent to distribute to support such a conclusion.

The Defendant's central argument is that he was, in essence, an afterthought in the DEA's investigation of Mr. Lyman and the other co-defendants and there was no probable cause to search his house. According to the Defendant, at its core the search warrant was based on the Defendant's interactions with a known drug dealer (that being Mr. Lyman) and the fact Defendant had a prior criminal history including a federal drug distribution conviction. The Defendant argues that his averred proximity to a drug dealer is insufficient to find probable cause for a search of his residence for evidence of drug dealing by him, even with his criminal conviction history. In short, the Defendant says that the warrant affidavit set forth little more than a hunch that a person previously convicted of a drug distribution crime was again involved in such illegal activity, and that under

settled Fourth Amendment law, that is simply not legally sufficient, and seeks suppression of the evidence seized pursuant to the warrant.

## II.    The Government's Response.

The Government filed a Response arguing that the search warrant was based on probable cause and, even if it was not, the Good Faith exception applies to insulate the fruits of the search from a suppression order. (ECF No. 159). The Government argues that there was sufficient probable cause to support the issuing judge's conclusion that it was probable the Defendant's residence contained evidence of drug trafficking because he was connected with known drug dealers who were acquiring and processing large quantities of drugs, specifically cocaine. The affidavit stated that Agent Bages believed drugs were transported into the Defendant's house after each interaction with Mr. Lyman. The Government argues that this information as it was set out in the warrant affidavit is enough to find that probable cause to search the Defendant's residence existed.

The Government then argues that even if probable cause is lacking to support the warrant and the search pursuant to it, the Good Faith exception applies to avoid the suppression of the evidence found in and seized from the Defendant's home. The Government argues that the warrant is not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." (ECF No. 159 at 19-20). The Government asserts this is more than a "bare bones" affidavit because it contained information about Agent Bages's experience, her training in investigation and arrests, as well as details of the investigation's surveillance operations along with information of and details about the witnessed drug and money transactions involving other co-defendants, which she said were of a kind with the conduct of the Defendant with Mr. Lyman. The

Government argues any reasonable officer acting in good faith would rely on Agent Bages's conclusions and the issuing judge's authorized warrant to execute the search.

### III.    The Defendant's Reply.

The Defendant filed a Reply arguing that the Good Faith exception does not apply in this case.[1] (ECF No. 162). The Defendant argues that no reasonable officer could rely on the warrant in good faith because the underlying affidavit lacked any indicia of probable cause to search the Defendant's residence, and it failed to particularize the place to be searched or the things to be seized. According to the Defendant, excluding the evidence here would also advance the deterrent goals of suppression.

More precisely, the Defendant argues that the Good Faith exception does not apply because, according to the Defendant, the warrant was based on an affidavit so lacking in any indicia of probable cause so as to render official belief in its existence entirely unreasonable. The Defendant characterizes Agent Bages's underlying affidavit as "bare bones" and argues it contains no evidence that the Defendant brought drugs to Mr. Lyman, or that Mr. Lyman brought drugs into the Defendant's house, or any other facts supporting the conclusion that the Defendant was involved in drug dealing with Mr. Lyman or otherwise, but instead contained only conclusions based on Agent Bages's opinions, the proximity of the Defendant and Mr. Lyman on only three occasions, and the fact that the Defendant had a prior federal cocaine dealing conviction. The Defendant also argues that the fact the agents executing the warrant left only the cover page and inventory from the search at the scene of the search suggests they did not have the full warrant

---

[1] The Defendant also argues that the Good Faith exception is unconstitutional but does so exclusively for purposes of preservation. (ECF No. 162 at 4). The Supreme Court has repeatedly endorsed the Good Faith exception, and this Court is bound to follow these precedents. *See United States v. Leon*, 468 U.S. 897, 924 (1984); *Illinois v. Krull*, 480 U.S. 340, 355 (1987); *Arizona v. Evans*, 514 U.S. 1, 14-15 (1995); *Davis v. United States*, 564 U.S. 229, 238-39 (2011).

with them when conducting the search and therefore did not know the actual scope of an authorized search, effectively converting the warrant to a "general warrant". According to the Defendant this is evidence that the warrant was secured with a bare bones affidavit and then given to colleagues who were ignorant of the circumstances of the warrant's issuance and under the belief that they would blindly rely on it.

Finally, the Defendant also argues that the Good Faith exception does not apply because the warrant did not particularize the place to be searched nor the things to be seized. The Defendant asserts that the agents executing the warrant did not have the list of places to be searched and the items to be seized with them when they conducted the search, only the warrant cover page and inventory sheet. The Defendant also alleges that the fact the police searched the vehicle of his girlfriend while his home was being searched is further evidence of this conclusion. And the Defendant argues that the fact the warrant was sealed does not excuse this failure.

The Defendant then asserts that suppressing the evidence here would deter future police misconduct. He argues that suppression would ensure that underlying warrant affidavits in future searches would contain enough detail to support probable cause for all defendants when there are numerous suspects of criminal activity, as opposed to using probable cause for some co-defendants as a pretext to search everyone arguably associated with them. According to the Defendant, law enforcement would be incentivized to perform thorough investigations on every suspected member of a conspiracy, rather than "adding one more person at the end." (ECF No. 162 at 6).

## IV.    Oral Argument.

The Court held oral argument on the Motion on October 17, 2025. At argument, the Defendant relied on the Third Circuit's ruling in *Virgin Islands v. John*, 654 F.3d 412 (3d Cir. 2011). In *John* the Third Circuit held that an affidavit concluding that "persons who commit sexual

offense crimes involving children customarily hide evidence of such offenses . . . in their homes" did not support a search of the home for child pornography. *Id.* at 419. The Court's reasoning was that there were no facts presented in the affidavit connecting sexual offense crimes more broadly to the keeping of child pornography in that location as to the involved defendant. *Id.* at 420. The conclusion that one fact often led to the other was one based only on a law enforcement officer's personal belief, and the Court held that a reasonable police officer would know that such a personal belief alone is insufficient for the existence of probable cause. Hence, the warrant was not supported by probable cause, and beyond that, it was so devoid of probable cause that the Good Faith exception to the warrant requirement did not apply to shield the evidence seized from suppression. *See id.*

The Defendant here has argued that Agent Bages's affidavit presented the same issues as the affidavit did in *John*. According to the Defendant, Agent Bages's conclusion that the Defendant was involved in drug trafficking was solely based on the belief that his association with Mr. Lyman indicated his involvement in Lyman's alleged drug dealing. Defendant argues that while evidence that a given individual was engaged in drug dealing would provide probable cause that the individual was storing drugs in their house, more facts were necessary for a reasoned "probable cause" conclusion that an individual who had only associated with someone else suspected of drug dealing was involved in that illicit activity, and thereby was storing drugs in their house. Defendant argues that, just like in *John*, any reasonable law enforcement officer would know that probable cause requires far more. Under Defendant's theory, because any reasonable police officer would know this, the Good Faith exception does not apply to avoid suppression here.

Defendant also argues the Good Faith exception did not apply for a different reason. This second reason, he says, is that the warrant was insufficiently particularized at time of execution

because it did not include a list of specific places to be searched or specific items to be seized. Defendant admitted that the warrant itself was sufficiently particular because it detailed the places to be searched and items to be seized via documents attached to and incorporated into it. However, he says that when law enforcement was executing the warrant, only the warrant's cover sheet was left at Defendant's residence, along with an inventory document when the search was concluded. Defendant argues that because the warrant attachments that set forth the places to be searched and the items to be seized were not left at the residence after the search, this is reason to believe that the executing agents did not have the warrant attachments with them when searching his residence. According to Defendant, if the executing agents did not have the attachments present with them when carrying out the search, then they would not know the limits of their search, either by locations to be searched nor as to what was to be searched for. Defendant argues that any reasonable law enforcement officer acting in good faith would know a valid warrant must place those limits on a search and then abide by them. And, therefore, the failure to do so renders the search unlawful, requiring suppression.

The Government disagrees and argues both that the warrant was supported by probable cause and that in any event, the Good Faith exception to suppression applies here. The Government argues that Agent Bages's affidavit provided probable cause to the issuing judge when considered in light of the accumulation of circumstantial evidence recited in the affidavit. According to the Government, in a large drug trafficking organization case the circumstantial evidence points towards searching associates who have substantial interactions with suspected criminals at the center of the criminal operation. The Government argues that the warrant was not one simply designed to just round up "the usual suspects," namely those with a criminal history of drug crimes, because it was focused on the timing of drugs coming into Allegheny County and the interactions

of those most directly involved (particularly Mr. Lyman) that immediately followed, and all of those (including the Defendant) involved in those interactions.

The Government also argues in the alternative that even if the warrant lacked probable cause to search Defendant's residence, the seized evidence should not be suppressed because the Good Faith exception to suppression applies. The Government argues that any reasonable law enforcement officer would rely on a federal Magistrate Judge's determination here that this warrant was supported by probable cause. Additionally, the Government argues that failure to leave a full copy of a warrant (more specifically, the warrant attachments) after the search was concluded is only a ministerial error and does not justify suppression, and that the record before the Court demonstrates that the officers executing the search where well aware of the scope and location of the involved search.

## V.    The Evidentiary Hearing.

Because there was a question of fact concerning what elements of the warrant the executing Agents had in their possession when searching Defendant's residence, the Court offered both parties the opportunity to participate in an evidentiary hearing on that matter. The Defendant took the Court up on this offer, and an evidentiary hearing was held on December 1, 2025. Three witnesses testified at the hearing: Special Agent Katelyn Bages, Task Force Officer Richard Kadlecik, and Tasha Lee Martin, the Defendant's longtime partner who resided with him at the residence that was searched.

Agent Bages testified about her producing the affidavit and receiving the search warrant. She stated that when preparing the affidavit, she and her team considered searching the homes of several individuals she personally believed were involved in the subject drug dealing operations. However, Agent Bages testified that she knew there was not probable cause to search the homes

12

of all of those people. Instead, Agent Bages claimed that she focused on the few individuals as to whom she believed that she had sufficient evidence to support a residential search. The Defendant was one of these few, and Agent Bages stated many others were not. Agent Bages claimed that when she requested the search warrant, the issuing judge signed it without any "push back" or requests for additional information. Her testimony at the hearing was not contradicted, and the Court found it to be credible.

Officer Richard Kadlecik led the team that executed the warrant. Officer Kadlecik testified that as team leader, he was responsible for coordinating the entry and search of Defendant's home. Officer Kadlecik stated that prior to conducting the search, he met with Agent Bages. During this meeting, Agent Bages provided Officer Kadlecik with details of the investigation into the Defendant and gave him a copy of the search warrant, the affidavit, and the accompanying attachments.

The morning of the search, Officer Kadlecik held a meeting with his search team. During this meeting he provided the team with photographs of the Defendant's home, photographs of the Defendant, copies of the search warrant and a briefing about what the team is supposed to be searching for and where they were to search. Officer Kadlecik testified that during this meeting one of his goals was to make the agents aware of the permissible scope of their search.

After the search, Officer Kadlecik admitted he did not leave a copy of the warrant attachments with the Defendant. Instead, he testified that he left the warrant cover sheet, and an inventory sheet describing what had been seized. Officer Kadlecik testified that he had the warrant attachments with him when executing the search but did not take them out of his folder to leave at the residence when the search was completed. Officer Kadlecik testified that this was a mistake caused by the fact he was unaware that he needed to leave the warrant attachments at the residence

13

after completing the search. His testimony was not contradicted, and the Court found it to be credible.

Finally, Ms. Tasha Lee Martin testified. Ms. Martin was present when Defendant's residence was searched. Ms. Martin explained that she consented to the search of her vehicle, which was parked outside of the residence, because the officers on the scene told her that this was the only way they would allow her and her son to sit in the car (which she had requested the ability to do) while the search of the house was being conducted. Ms. Martin confirmed that after the search was completed, only a warrant cover sheet and inventory sheet were left by the executing agents. Her testimony was not contradicted, and the Court found it to be credible.

## DISCUSSION

Defendant asks that the Court suppress all of the evidence seized at his residence. He first argues that the warrant relied upon to search his residence lacked probable cause. He then argues that the warrant was so defective that no reasonable law enforcement officer could rely on it in good faith. According to the Defendant, the warrant and search was fatally defective in two respects. First he says that it "was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010). Second, he says that it "failed to particularize the place to be searched or the things to be seized." *Id.* Defendant argues that granting his Motion would advance the deterrent goals of suppression by disincentivizing the use of probable cause to search the residences of some criminal defendants as a pretext to search the residences of everyone associated with them. The Court will address those contentions in turn.

I.     **The Warrant Lacked Sufficient Probable Cause to Search the Defendant's Residence.**

The Fourth Amendment ensures "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. If the warrant used to search Defendant's residence was supported by probable cause in the first place, the Court need go no further. Defendant's Motion to Suppress would be denied on the simple basis that the warrant requirement has been met.

The probable cause requirement exists "to affirm and preserve a cherished rule of the common law, designed to prevent the issue of groundless warrants." *McGrain v. Daugherty*, 273 U.S. 135, 156 (1927). Allowing the prosecutorial use of evidence seized pursuant to a groundless warrant would undermine the protections of the rule. *See Mapp v. Ohio*, 367 U.S. 643, 648 (1961). Suppression exists to support the probable cause requirement by punishing searches and seizures made in its absence. *See id.* But if probable cause exists, suppressing evidence would impose "substantial social costs" with no benefit. *Leon*, 468 U.S. at 907.

Probable cause exists where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Where a warrant has been issued, reviewing the warrant for supporting probable cause is limited to evaluating if "the magistrate had a substantial basis for concluding that probable cause existed." *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010). In determining whether a "substantial basis" exists, a district court must assess "the totality of the circumstances" that were before the issuing authority at the time the warrant was issued. *United States v. Ritter*, 416 F.3d 256, 262 (3d Cir. 2005) (quoting *Gates*, 462 U.S. at 236).

Direct evidence linking the place to be searched to the crime under investigation is not required for probable cause. *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993). Indeed, "probable cause can be, and often is, inferred by 'considering the type of crime, the nature of the

items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide'" evidence of the crime. *Id.* (quoting *United States v. Jackson*, 756 F.2d 703, 705 (9th Cir. 1985)). Generally, "[i]f there is probable cause to believe that someone committed a crime, then the likelihood that the person's residence contains evidence of the crime increases." *Id.* at 1055-56.

However, the fact an individual is suspected of being a drug dealer does not give law enforcement an unqualified right to search their residence. Instead, probable cause in these cases comes from "evidence supporting three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities." *United States v. Burton*, 288 F.3d 91, 104 (3d Cir. 2002). In the present case, Agent Bages's affidavit must include sufficient support for each of these three premises to provide probable cause for a judge to issue a search warrant for the Defendant's home.

Although a close call, Agent Bages's warrant affidavit falls short of the mark, at least in regard to the search of the Defendant's residence. Crucially, there is little evidence in the affidavit showing that the Defendant is actually a drug dealer, at least at the time the warrant was sought and issued. When considering the totality of the circumstances, what can be concluded from Agent Bages's affidavit is that the Defendant was associated with an individual engaged in large-scale cocaine drug dealing (Mr. Lyman), that there were physical visits to and by them to each other's homes, that two of these visits involved luggage/containers, that Lyman's interactions with other suspects also involved similar luggage and containers, and that the Defendant also had a prior federal cocaine dealing conviction from 2001. But "a person's mere propinquity to others

independently suspected of criminal activity does not, without more, give rise to probable cause." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

Agent Bages's affidavit gives little more. It contains none of the types of evidence generally used to show there is probable cause to suspect that a given individual is actually a drug dealer. *See United States v. Williams*, 974 F.3d 320, 351-52 (3d Cir. 2020) (holding a controlled purchase of drugs from the defendant was sufficient to show probable cause the defendant was actually a drug dealer); *United States v. Suarez-Arzon*, 664 Fed. Appx. 180, 183 (3d Cir. 2016) (holding that a corroborated tip the defendant was engaged in drug dealing when combined with what appeared to be an attempted drug transaction and the defendant's attempt to flee upon seeing unmarked police cars was sufficient to show probable cause the defendant was actually a drug dealer).

It is notable that in the Government's Response to the Defendant's Motion, (ECF No. 159), the probable cause argument is almost entirely based on observations of activities of the co-defendants in this case. The Government relies on 33 paragraphs of factual allegations about on-going drug dealing in the warrant affidavit, but only 6 of these mention the Defendant. (ECF No. 159 at 7-15). Instead, the facts the Government points to from the affidavit focus almost entirely on the actions of Mr. Lyman and the related actions of other co-defendants. (ECF No. 159 at 7-15). When arguing the affidavit provided probable cause to suspect Defendant of being a drug dealer, the Government states that this conclusion comes from "the entirety of the investigation." (ECF No. 159 at 16). But the entirety of the investigation, as detailed by the Government in its own Response, included little about the actions of the Defendant, with the affidavit only referencing his three residential interactions with Mr. Lyman as noted above along with his prior federal drug conviction. Particularly as compared to the information advanced in the affidavit as

to the actions of others who were to be the targets of law enforcement searches under this warrant, there were no observed controlled  drug transactions involving the Defendant, (ECF No. 158-1 ¶¶ 34-35), no surveillance observations of Defendant making frequent visits to the homes of multiple co-defendants, (ECF No. 158 ¶¶ 64-65), no reports of the Defendant from reliable (or any) witnesses about the Defendant being so engaged, (ECF No. 158-1 ¶ 30), not even any anonymous tips about his engagement in drug dealing.

Read with deference to the resulting issuance of the search warrant, Agent Bages affidavit recites that the Defendant and Mr. Lyman visited one another in one another's homes on three occasions, and that on one of them, the Defendant took a suitcase into and then out of Mr. Lyman's residence, with it being heavier when it came out than when it went in, and then on another, Mr. Lyman loaded a duffle bag into his vehicle before he went to the Defendant's home. What remains in the record is that the Defendant had a prior federal drug conviction and had an associational relationship with a putative major drug dealer that included three residential visits with one another. And while this may logically raise some level of suspicion, the Court is not convinced that it is fact-based suspicion that goes beyond a law enforcement hunch so as to meet the requirements for probable cause for the search warrant.

What is in the warrant affidavit falls factually short of meeting the three-part test from *Burton* as set out above and boils down to an educated guess that there would be evidence of criminal activity in the Defendant's residence. While that turned out to be correct, the issues here are not resolved with a backward look at how events unfolded, *See United States v. Ubiles*, 224 F.3d 213, 218 (3d Cir. 2000); *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993), and the level and nature of evidence recited in the search warrant affidavit here does not provide the requisite probably cause necessary to support the issuance of that warrant as to the Defendant's home. The

Court therefore concludes that the affidavit and the resulting warrant were not supported by probable cause sufficient to authorize the search the Defendant's home.

That conclusion then takes the issue to be decided to the application of the Good Faith exception to the exclusionary rule.

## II.    The Good Faith Exception Applies Here and Suppression is Not Warranted.

That an issued warrant lacks probable cause is not on its own sufficient to trigger the suppression of seized evidence. *See United States v. Leon*, 468 U.S. 897, 922 (1984). Suppression is an "extreme sanction" that exists to deter inappropriate and unconstitutional police conduct. *Id.* at 926 "[S]uppressing evidence will not encourage deterrence [] where the government acted 'upon an objectively reasonable good faith belief in the legality of [its] conduct' when conducting a search." *United States v. Goldstein*, 914 F.3d 200, 203-04 (3d Cir. 2019) (quoting *United States v. Katzin*, 769 F.3d 163, 182 (3d Cir. 2014)). The deterrent goals of suppression are not furthered by effectively sanctioning a police officer who reasonably relied on a judicially issued search warrant in good faith, even when that warrant is later invalidated for a lack of probable cause.

The Third Circuit has identified four scenarios in which reliance on a search warrant is unreasonable. These are:

(1)  the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit;

(2)  the magistrate abandoned their judicial role and failed to perform their neutral and detached function;

(3)  the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

(4)  the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*United States v. Werdene*, 883 F.3d 204, 217 (3d Cir. 2018). Of these four scenarios, Defendant claims both the third and fourth are applicable to this case. But even if Defendant is correct, the evidence still will only be suppressed if it will "result in appreciable deterrence." *Leon*, 468 U.S. at 909. That all means that the law enforcement conduct in this case must go above mere negligence, and it must be "deliberate, reckless, or grossly negligent" or involve "recurring or systemic negligence." *United States v. Katzin*, 769 F.3d 163, 171 (3d Cir. 2014).

   a. *Agent Bages's Affidavit Contains Sufficient Indicia Of Probable Cause To Justify Law Enforcement in Their Search of the Defendant's Residence Even if the Warrant was Invalid.*

   Evidence has not been advanced to the Court that the law enforcement officers executing the search of the Defendant's home deliberately violated his Fourth Amendment rights, nor has evidence been advanced that they executed that search "recklessly", that being with a conscious disregard of any substantial doubt as to its validity. *See Recklessly*, Black's Law Dictionary (12th ed. 2024); *see also Harvard v. Cesnalis*, 973 F.3d 190, 200 (3d Cir. 2020). And there is also no evidence in the record that the officers executing the search, or their employing agencies, have been engaged in recurring or systemic violations of the Fourth Amendment. That leaves "gross negligence." A reasonable law enforcement officer is acting with "gross negligence" when they execute a search warrant objectively lacking in any indicia of probable cause. *See John*, 654 F.3d at 420-21.

   A reasonable officer should know that a warrant lacks any indicia of probable cause and therefore is insufficient to support a search when the supporting affidavit lacks factual allegations realistically connecting the defendant's actions to the objects of the search. A reasonable officer understands a search cannot be predicated on a "'bare bones' affidavit." *Leon*, 468 U.S. at 926. The allegations in the affidavit, while short of providing probable cause, must at least create some

factual connection between the defendant's actions and the criminal conduct the fruits of which are the object of the search.

A touchstone case in the Third Circuit is *Virgin Islands v. John*, which the Defendant raised at oral argument. In *John*, the home of a sixth-grade teacher was searched for child pornography after several of his students reported that he had abused them in the classroom. 654 F.3d 412, 413-14 (3d Cir. 2011). The officers searched the teacher's home based on an affidavit that alleged "persons who commit sexual offense crimes involving children customarily hide evidence of such offenses . . . in their homes." *Id.* at 419. The Third Circuit concluded that the involved affidavit, while sufficient to establish probable cause for a search related to the crime of sexual assault, lacked any indicia of probable cause that the defendant also possessed child pornography. *See id.* The problem was that the only connection in the affidavit between the defendant's actions of sexually abusing children in his classroom and the crime of possessing child pornography was the assumption that a person who commits the former crime is likely to also commit the latter. *See id.* at 420. Even if this assumption were generically true, the affidavit would still need to contain some factual allegations to support such a connection above a personal belief supporting the inference. *See id.*   The Court concluded that the officers executing that search warrant were "grossly negligent" in not recognizing that that lack of connection demonstrated a lack of supporting probable cause to search. *See id.* at 420-21.

Contrast *John* with *United States v. Caesar*, which concluded that an officer did rely on a defective warrant in good faith. In *Caesar* a warrant was issued to search a defendant's home for child pornography. 2 F.4th 160, 163 (3d Cir. 2021). The affidavit supporting the warrant alleged that the man had sexually abused children in his home, that he had kept the victims' underwear, and that he had used the internet to purchase photos and videos of partially clothed children. *Id.*

Although conceding that it was a close question, the Third Circuit held that a reasonable officer relying on these facts was not "grossly negligent" in concluding the warrant for the search of that place for evidence of all of the referenced criminal conduct was valid. *See id.* at 174. This was because there was at least some plausible connection between a defendant who had purchased images of partially clothed children and who sexually abused children in his home and his keeping of explicit images of those children there. *See id.* at 175. Objectively, a reasonable officer could conclude in good faith that if the defendant kept the victims used underwear in his home "he would have kept other mementos of the boys" too, including explicit photographs. *Id.*

If a factual connection for purposes of the Good Faith exception is alleged, it cannot be one that is baseless. The bare personal belief that such a connection exists is insufficient without additional factual support for it, *See United States v. Ritter*, 416 F.3d 256, 263 (3d Cir. 2005), as is the use of a single piece of stale evidence to allege a connection, *See United States v. Zimmerman*, 277 F.3d 426, 437 (3d Cir. 2002). An uncorroborated or unreliable anonymous tip should also make a reasonable officer think twice about the validity of their search, warrant or not. *See United States v. Pavulak*, 700 F.3d 651, 664 (3d Cir. 2012). Simply put, the warrant must include some plausible factual link between the witnessed behavior and the object of the search.

The Third Circuit is not alone in reaching this conclusion. Other Circuits have also held that an officer cannot rely on a warrant in good faith when it lacks such a connection. *See United States v. Waide*, 60 F.4th 327, 342 (6th Cir. 2022) (warrant lacking any indicia of probable cause when there was no connection between defendant's refusal to provide home security footage and the keeping of arson evidence in his home); *United States v. Lyles*, 910 F.3d 787, 797 (4th Cir. 2018) (warrant lacking any indicia of probable cause when only connection between defendant and drug dealing was an officer's personal belief); *United States v. Cordova*, 792 F.3d 1220, 1224

(10th Cir. 2015) (warrant lacking any indicia of probable cause when there was no connection between defendant's relationship with known drug dealer and defendant keeping drugs in his home).

In this case, Agent Bages's affidavit falls short of the probable cause mark but nonetheless provided a sufficient plausible factual link between the Defendant's behavior, Mr. Lyman's conduct relative to him, and the suspected crime of trafficking illegal narcotics, raising the executing agent's reliance on the warrant sufficiently above gross negligence, if it were negligence at all. The affidavit here included details about video surveillance wherein Mr. Lyman was seen next to an open suitcase containing what is believed to be kilograms of cocaine. (ECF No. 158-1 ¶ 21). This, coupled with reliable confidential source information which recited the transmission of large amounts of drugs and money by and to/from Mr. Lyman by him in conjunction with others; led Agent Bages and the involved investigators to conclude that Mr. Lyman and his associates would transport and move large quantities of illegal narcotics and United States currency in innocuous looking luggage and bags in similar fashion. (ECF No. 158-1 ¶¶ 21, 35).

Based on these observations. Mr. Lyman's believed and recited method of operation was to use various types of bags, including suitcases, duffle bags, backpacks and handheld satchels to drop off narcotics at his associates' homes and to pick up cash payments, and vice versa. (ECF No. 158-1 ¶¶ 14-15 (Mr. Lyman carrying a black duffle bag into a co-defendant's home and leaving with a small white bag), 52 (Mr. Lyman entering someone's car with a backpack and leaving without it), 54-57 (Mr. Lyman carrying a black and white backpack and red nylon bag to and from his home), 65 (a co-defendant carrying a draw string bag into Mr. Lyman's home and leaving with a smaller white plastic bag), 71 (a co-defendant entering his home with a green fabric tote bag), 83 (Mr. Lyman leaving his home with a white bag), 86 (Mr. Lyman entering a co-

defendant's home with a red nylon bag and leaving without it)). In her affidavit, Agent Bages's detailed observations of the Defendant's and Lyman's actions relative to one another that fit comfortably into that method of operation. (ECF No. 158-1 ¶¶ 73-5; 87).

Defendant was observed visiting Mr. Lyman's home, personally carrying a suitcase inside, and then leaving the home with the same suitcase that now appeared to be full to the degree that the Defendant seemed to strain in loading it back into his vehicle. (ECF No. 158-1 ¶¶ 73-74). Additionally, Mr. Lyman visited the Defendant's home after loading a duffle bag into his (Lyman's) car. (ECF No. 158-1 ¶ 87). Because there was no visual surveillance of Defendant's home, there is no visual evidence that Mr. Lyman took that duffle bag into Defendant's home during this visit. However, when Mr. Lyman arrived back at his own home where he was under visual surveillance, he was not observed with the duffle bag. (ECF No. 158-1 ¶ 88).

A reasonable officer armed with a judicially issued search warrant could see Defendant's visit to Mr. Lyman's home and Mr. Lyman's subsequent visits to the Defendant's as sufficient to support the Magistrate Judge's finding of probable cause when considered in the context of the rest of the investigation as detailed in the affidavit. Probable cause "depends on the totality of the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). A reasonable officer would know this and understand that even if the Defendant's actions alone could turn out to be innocuous, they reasonably could support a finding of probable cause when understood in combination with the other factual observations presented in the warrant affidavit. And a reasonable officer could properly conclude that the issuing magistrate judge had correctly found probable cause to search Defendant's home when considering observations of the Defendant taking actions congruent with Mr. Lyman's method of trafficking illegal narcotics. To use the vernacular, there was abundant evidence in the affidavit of an "M.O." of Mr. Lyman's asserted drug dealing operations that

24

involved Mr. Lyman and others moving and concealing large amounts of drugs and cash in various types of luggage/satchels/containers, and then moving them into/out of various homes after short visits, as had occurred with at least one of the observed visits by the Defendant to Mr. Lyman's residence.

Unlike the situation in *John,* the affidavit in this case presented to the executing officers a logical factual connection between the Defendant and the suspected crime. In *John* the only connection between the defendant's sexual abuse and his suspected crime of possessing child pornography was the affiant's personal belief that one led to the other. 654 F.3d at 420. A reasonably well-trained officer would know that probable cause must be based on more than those sorts of personal beliefs about criminal behavior and would be grossly negligent in relying on a warrant solely predicated on such a personal belief. Here, the affiant has based her conclusions not only on such a personal belief, but on factual observations of the conduct of the Defendant that was congruent with the actions of others visually connected with the drugs and cash that underlay the charges against Mr. Lyman and the other defendants here.

Because the affidavit's recitation of facts about the actions involving the Defendant and the background facts surrounding them demonstrated some plausible factual link, an executing officer would reasonably conclude that there was probable cause to search Defendant's home for evidence of drug trafficking crimes, or even more precisely, that there was no reasonable basis to doubt that it existed. There were factual observations of the Defendant in the context of the method by which the cocaine trafficking operation was being conducted, and this case sits firmly in the arena of *Caesar*. Practically, the difference between *John* and *Caesar* is that the latter included factual observations that suggested the defendant's sexual abuse also involved the keeping of certain "mementos" involving child pornography in his home. 2 F.4th at 175. The officers who

executed the search warrant in *Caesar* were not faulted for concluding the defendant possessed child pornography because the affidavit detailed a pattern of behavior which was congruent with the suspected crime. They were therefore not grossly negligent in abiding by the judicially issued warrant in that case.

That is what happened in this case. Agent Bages detailed Mr. Lyman's observed pattern of behavior when transporting narcotics and currency, and the behavior of others involved in those activities. Agent Bages continued to articulate Defendant's participation in that pattern of behavior, creating a plausible and objectively reasonable factual connection between his actions and the believed transportation of narcotics and currency. For the Good Faith analysis, this is enough for the Court to conclude that it was not "entirely unreasonable" for law enforcement officers to conclude the warrant was valid and that it properly authorized the search of the Defendant's home, and that they were not "grossly negligent" in doing so. *United States v. Smith*, No. 24-2734, 2025 U.S. App. LEXIS 32802, at *3 (3d Cir. Dec. 16, 2025) (quoting *Zimmerman*, 277 F.3d at 437). The Good Faith exception does not impose an obligation to suppress the evidence seized here, as an objectively reasonable police officer reviewing the warrant and affidavit and then executing the search would not have concluded that the warrant was so lacking in probable cause that the search could not occur consistent with the Fourth Amendment.

    b.  *The Record Does Not Demonstrate That the Warrant Failed To Adequately Describe the Place To Be Searched Or the Things To Be Seized.*

A reasonable officer would know that a warrant is facially deficient due to a lack of a particularized description of the places to be searched and the things to be seized when it fails to limit an officer's search to items with the necessary nexus to the alleged offenses. Any reasonable officer should know that the Fourth Amendment prohibits warrants with only a vague description authorizing "a general, exploratory rummaging in a person's belongings." *Coolidge v. New*

*Hampshire*, 403 U.S. 443, 467 (1971). A warrant without any description at all is obviously invalid to even the most junior police officer. *See Franz*, 772 F.3d at 144. But officers should also know that even when a warrant contains some description of the place to be searched and items to be seized, it is still facially deficient when it fails to place adequate limits on that search.

What counts as an adequate limit depends on the alleged offense, but in all contexts the warrant must sufficiently instruct an officer when they have come across evidence of a crime or contraband to be seized as opposed to an innocent possession. For example, a warrant for the search of evidence relating to an alleged white-collar crime can properly be broad due to the inherent complexity of that type of offense. *See United States v. Yusuf*, 461 F.3d 374, 395 (3d Cir. 2006). In those circumstances, it is necessary for police to search for a broad range of evidence to "sort[] out the details of th[e] sophisticated scheme." *United States v. Am. Investors of Pittsburgh*, 879 F.3d 1087, 1106 (3d Cir. 1989). But that broad range is not authorization to search for anything and everything. An officer must still have some instruction in the warrant as to what kind of search will lead to relevant evidence, and what kind of search will impermissibly intrude on the defendant's innocent possessions.

An adequate limit for an alleged drug trafficking offense is a list of the places and persons to be searched. It is not necessary to specify what type of drug an officer should be looking for, because there is little difference where an officer would search for different types of illegally possessed drugs based on the type of drug involved. *See United States v. Sierra*, 585 F. Supp. 1236, 1242 (D.N.J. 1984). Persons to be searched must be identified, but that identification can be a general description. *See Doe v. Groody*, 361 F.3d 232, 239-40 (3d Cir. 2004). A warrant must also identify the address of the place to be searched and, if it is a multi-unit building, specify which unit. *See United States v. Ritter*, 416 F.3d 256, 261-69 (3d Cir. 2005). Once a place is adequately

specified, the search of other structures and vehicles on that property may also be presumably authorized. *See United States v. Perez*, No. 11-256, 2011 U.S. Dist. LEXIS 86820, at *8-9 (E.D. Pa. Aug. 5, 2011). An officer searching for evidence of drug trafficking can reasonably rely on a warrant in good faith when it so outlines who or where to search, and what is to be searched for.

When a warrant on its face is inadequately particular, it can be cured by the incorporation of other documents. If a warrant depends on the incorporation of other documents, those documents must physically accompany the warrant during its execution. *See Bartholomew*, 221 F.3d at 428-29. This is because the documents can only place an adequate limit on conduct of the executing officers if they can reference it during the search. *See id.* at 429. The fact these documents may be filed under seal is no excuse for failing to carry them during a search's execution. *See id.* at 429-30. *Cf. Groh v. Ramirez*, 540 U.S. 551, 558 (2004) (refusing to consider documents placed under seal because they did not "accompany the warrant").

The warrant document itself used to search Defendant's residence on its own was not adequately "particular," but was made so by its attachments. The warrant incorporated the attachments by referencing them in the sections setting out a description of the property to be searched and the items to be seized. Attachment A-5 to the warrant described the location to be searched as to this Defendant and provided a photograph of the Defendant's property. Attachment B detailed what was to be seized. When reading the warrant in connection to the incorporated attachments, it is adequately particularized. *United States v. Johnson*, 690 F.2d 60, 64 (3d Cir.1982) ("When a warrant is accompanied by an affidavit that is incorporated by reference, the affidavit may be used in construing the scope of the warrant.").

An officer would be acting reasonably when executing a warrant to search the Defendant's home that included and was based upon Attachment A-5 and Attachment B. And that is precisely

28

what occurred in this case. Although neither attachment was left on the scene after completing the search, Officer Kadlecik testified they were present during its execution. According to Officer Kadlecik, the executing agents were instructed as to its limits during a meeting held with them the morning of the search and had the opportunity to thereafter consult Officer Kadlecik and to read the full warrant and its attachments if they were unsure if an item could be properly seized. So long as the attachments were present at the time of the search, failure to leave them behind is not adequate grounds for suppression. *See United States v. Durante*, 612 Fed. Appx. 129, 131-32 (3d Cir. 2015). An officer operating under these circumstances would be acting on a good faith belief that the warrant was sufficiently particularized and that the involved search and seizure was lawful and properly authorized.[2]

    *c. Granting Defendant's Suppression Motion Would Not Advance the Goals Of Suppression.*

    Suppression is both a tool designed to reinforce respect for the Fourth Amendment and a heavy-duty sanction of a search conducted outside of Constitutional limits. Nothing in the Constitution demands suppression of evidence for all Fourth Amendment violations. *See Davis v. United States*, 564 U.S. 229, 236 (2011). Suppression is a "prudential" doctrine created to deter future Fourth Amendment violations. *Id.* Because suppression comes at the cost of keeping what would otherwise be relevant (perhaps very relevant) evidence from a fact finder, it is always a "last resort." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

    And beyond that, even if a police officer failed to act in good faith, suppression is only warranted where it deters future misconduct. Determining if suppression is desirable involves "a

---

[2] Federal Rule of Criminal Procedure 41 requires law enforcement officers to leave behind a copy of the warrant and all its attachments after executing a search. Fed. R. Crim. P. 41(f)(1)(C). However, violating Rule 41 by failing to leave behind a warrant's attachments is a ministerial violation, not a Constitutional one, and does not mandate suppression. *See United States v. Durante*, 612 Fed. Appx. 129, 131-32 (3d Cir. 2015). This is especially true in cases like this, where the Defendant has been provided an inventory sheet detailing the property seized after the search. *See United States v. Sigillito*, 759 F.3d 913, 925 (8th Cir. 2014).

cost-benefit analysis, balancing the 'deterrence benefits of suppression' against its 'substantial social costs.'" *United States v. Franz*, 772 F.3d 134, 145 (3d Cir. 2014) (quoting *Davis v. United States*, 564 U.S. 229, 237 (2011)). The culpability of the officer is a key component of this analysis. *Herring v. United States*, 555 U.S. 135, 143 (2009). Suppression motions should punish officers whose lack of good faith is the result of "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *Franz*, 772 F.3d at 145. Suppression is not justified when an officer made "an isolated mistake." *Id.* at 148. So, the question here boils down to what to those words and phrases mean in these circumstances.

"To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. This is a cost-benefit analysis. *Franz*, 772 F.3d at 145. When police misconduct is the result of deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, "the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis*, 564 U.S. at 238. In contrast where police conduct "involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Id.*

For all of the reasons set out above, the Court cannot say that the conduct of law enforcement officials in this case was the result of deliberate, reckless, grossly negligent, or even negligent disregard for Fourth Amendment rights. As the preceding analysis illustrates, the agents searching Defendant's home were acting objectively reasonably in believing the warrant was valid and sufficiently supported by probable cause. Because the agents acted reasonably, suppressing the evidence found at Defendant's home would not deter future law enforcement misconduct. *See Davis*, 564 U.S. at 238.

## <u>CONCLUSION</u>

The Defendant asks the Court to suppress evidence seized from his home and allegedly tying him to a large-scale drug trafficking operation. The Defendant bases this request on a conclusion that the affidavit underlying the warrant used to search his home was insufficient to support a finding of probable cause by the issuing judge. The Defendant is correct in his conclusion to that point, but incorrect that this then requires suppression. While the affidavit did not meet the bar for probable cause, it was not so devoid of facts connecting the Defendant to the suspected crime to render the executing officers' reliance upon it so unreasonable as to be "grossly negligent." Nor was the warrant inadequately particularized when read in conjunction with its attachments. A reasonable officer could rely on the warrant involved here in good faith as being legally and Constitutionally valid. Because suppression is inappropriate when the evidence seized is the result of law enforcement officers acting in such good faith, the Defendant's Motion to Suppress Physical Evidence at ECF No. 158 is DENIED

**SO ORDERED** this 5th day of February 2026.

/s/ Mark R. Hornak
Mark R. Hornak
United States District Judge